UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARRY NELSON,

                 Plaintiff,

      - against -

NEW YORK STOCK EXCHANGE, INC.,

                 Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JUDGE CHIN**

**05 CV 6371**

05 Civ. _____

<u>COMPLAINT</u>

<u>ECF Case</u>

PLAINTIFF DEMANDS A TRIAL
<u>BY JURY IN THIS ACTION</u>

RECEIVED
JUL 1 2 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Harry Nelson ("Nelson"), by his attorneys, Vladeck, Waldman, Elias &

Engelhard, P.C., complaining of defendant, the New York Stock Exchange, Inc. ("NYSE" or

"defendant"), alleges as follows:

<u>NATURE OF THE ACTION</u>

1.      This action is brought to remedy discrimination on the basis of race in the

terms, conditions, and privileges of employment in violation of 42 U.S.C. § 1981 ("Section

1981"); the New York State Human Rights Law, Executive Law § 290 <u>et seq.</u> ("Human Rights

Law"); and the Administrative Code of the City of New York § 8-101 <u>et seq.</u> ("City Law").

2.      Injunctive and declaratory relief, recovery of benefits, damages, and other

appropriate legal and equitable relief are sought pursuant to Section 1981, the Human Rights

Law § 297 (9), and the City Law §§ 8-502 (a) and (f).

<u>JURISDICTION AND VENUE</u>

3.      Plaintiff is an African-American male and a resident of New Jersey.

4.      Defendant NYSE is an exchange whose members trade securities. Its principal place of business is in New York, New York. NYSE is an employer within the meaning of Section 1981, the Human Rights Law, and the City Law.

5.      Jurisdiction of this Court with respect to the Section 1981 claim is proper under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's Human Rights Law and City Law claims which derive from the same facts and circumstances as his Section 1981 claim. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1332 because of the diversity of the parties and because the amount in controversy exclusive of interest exceeds $75,000.

6.      Pursuant to § 8-502(c) of the City Law, copies of this Complaint were served upon the New York City Commission on Human Rights and the Corporation Counsel of New York City before the Complaint was filed.

## FACTUAL ALLEGATIONS

7.      Plaintiff has over 30 years of experience on Wall Street. Prior to working on Wall Street, Nelson earned a Bachelor's degree in Accounting and a Master's degree in Business Administration.

8.      In 1979, Nelson was hired by NYSE as an Auditor in its Auditing Department, with a Salary Grade 22.

9.      During his years at NYSE, Nelson has repeatedly applied for promotion to higher grades. Promotions are reflected in upward changes in grades. Each time that he applied, he was told that the job that he had applied for would not be a "good fit" or that he was overqualified for the position. His efforts to be upgraded go back to his early years with NYSE.

230000 v1

During Nelson's early years at NYSE his grade increased only from Grade 22 to Grade 25.

10.     In 1986, Charles Jordan ("Jordan"), a financial manager who was the only African American in the Financial Planning and Analysis group, was promoted. Jordan offered Nelson a position as a Financial Analyst in the Financial Planning and Analysis group, with a salary grade of 26, which Nelson accepted.

11.     Two months later, Janice Stahura ("Stahura"), a white manager who was junior to Jordan, was promoted to a position in which she was Jordan's supervisor; Jordan shortly thereafter left NYSE. Nelson was then the only African American remaining in the Financial Planning and Analysis group. In 1987, Nelson wrote to Joseph P. Johnson ("Johnson"), then Senior Vice President of Human Resources, expressing concern about race discrimination in Financial Planning and Analysis; he was then promoted to Grade 27. In and around this time period there were approximately 20 white employees in the Financial Planning and Analysis group.

12.     Nelson's performance as a Financial Analyst has been excellent, and he has received consistently good reviews for his performance, as well as praise from his colleagues. Despite this, Nelson has never been promoted from Grade 27. Nelson's earnings have been limited by NYSE's refusal to promote him.

13.     Nelson was regularly excluded from opportunities for training and professional development that NYSE offered to his white colleagues.

14.     In his early years with NYSE, Nelson repeatedly complained to the NYSE's Human Resources department about the lack of advancement opportunities for African Americans. No action was taken by the Human Resources department to remedy the situation,

and he ultimately realized that his complaints were unavailing.

15.     During Nelson's tenure at NYSE, many individuals who are not African American and were less qualified than he were promoted above him.

16.     Methods of achieving promotion at NYSE vary.  Grade 30 positions or above are never posted.  Relatively few positions above Grade 27 are posted.  When an internal candidate is chosen for promotion to an open position, the position is either not posted, or posted with an indication that an internal candidate has been chosen.   Individuals are also promoted as a result of "mentoring" -- i.e. when a higher level NYSE employee is promoted, he or she sometimes brings some of his or her direct reports to work below him or her in the new position.  The grade and position of the direct report is then raised.

17.     Although Nelson has not been promoted for nearly 20 years, his responsibilities have increased over time.  Nelson is now one of five Business Unit Controllers in the Business Division of Financial Planning and Analysis.  Prior to November 2004, Nelson was responsible for overseeing seven units.  None of his peers, however, was responsible for more than three units.

18.     The NYSE culture that foreclosed Nelson's opportunities for advancement also made it difficult for African Americans to remain in their positions.  In February 2004, Amy Butte ("Butte"), a white woman, became Chief Financial Officer of NYSE.  At the time, Carlos Casanova ("Casanova"), an African-American man, held the position of Assistant Controller.  He was the highest-ranking African American in the Finance department and close to the highest ranking African American at NYSE.  He reported directly to Butte.  During her first months at NYSE, Butte made the professional employees in the Finance department aware that she was

scrutinizing Casanova's performance, assigned him unnecessary and duplicative tasks that made his job more difficult, and unjustly criticized his work. Butte failed to provide Casanova with information that he needed to perform his job properly, and cut him out of decision-making processes. After several months, Casanova, in the summer of 2004, left NYSE making African Americans aware that the corporate culture had not improved.

19.     Butte's behavior toward Nelson, now the highest-ranking African American in the Finance department, was similarly and publicly hostile. When she first became Chief Financial Officer, Butte met with each of the Business Unit Controllers individually. Butte met with each of Nelson's white colleagues for over an hour. When she met with Nelson, she told him that he had surprised her by correctly answering a question that none of his colleagues had been able to answer. Nevertheless, Butte concluded her meeting with Nelson after about 15 minutes. When Butte formed a number of committees designed to reorganize the Financial Planning and Analysis department and NYSE as a whole, she appointed several of Nelson's white colleagues to the committees, but did not appoint Nelson. Butte, in fact, stripped Nelson of two of his most visible tasks.

20.     Prior to the time that Butte became Chief Financial Officer, one of Nelson's most visible responsibilities was the compilation of Quarterly Reports for NYSE. Nelson was first assigned this task in 1992 following the promotion of the white woman who had performed this task. The woman who had prepared the reports took approximately three months to do so; Nelson compiled and issued the Quarterly Report in less than three weeks even though his version included more detail. The Quarterly Report is a highly visible document. Although his predecessor had been permitted to publish the Report under her own name, when Nelson took

over the task, the Quarterly Report was published under the name of Nelson's supervisor, Mitchell Edelson ("Edelson").  Butte took the responsibility for compiling the Quarterly report away from Nelson shortly after she became Chief Financial Officer.

21.    Nelson was responsible for the compilation of information concerning capital expenditures by NYSE.  In or around 1990, Salvatore Tuminello ("Tuminello"), one of Nelson's peers in the Finance department, was assigned to develop a system to track NYSE salary expenditures, and Nelson was assigned to develop a system by which the Department could track capital expenditures.  Tuminello gave up on developing a tracking system for NYSE salaries, and NYSE hired a consultant to develop the system at substantial cost.  Nelson developed a system that tracked the NYSE's capital expenditures, and kept the system running for over 14 years at no additional cost to NYSE.  Tuminello was promoted -- but Nelson was not.  Butte summarily took away Nelson's responsibility for tracking NYSE capital expenditures shortly after she became Chief Financial Officer.

22.    In his 1996 letter to Human Resources, Nelson said that Edelson was hostile to African Americans and that Edelson's white subordinates followed Edelson's example. From the time that Edelson became Nelson's supervisor, he avoided interacting with Nelson.  It was and is Edelson's practice to hold  meetings with white Business Unit Controllers who report to him, but he does not invite Nelson, the only African-American Business Unit Controller. Consequently, Nelson often learns about important developments in his department through third parties.  Nelson is also often the last Business Unit Coordinator to be given information that he needs to meet his assigned responsibilities in a timely and efficient manner.

23.    The attitude of senior management of NYSE toward Nelson and other

African Americans has influenced the way that other people at NYSE treat them.   The individuals whom Butte has hired in Finance have demonstrated that they are reluctant to work with or interact with Nelson.   This attitude has undermined Nelson's authority to such an extent that Budget Coordinators with whom Nelson works often call Edelson to verify information given to them by Nelson.   Edelson confirms the information that Nelson gives to the Budget Coordinators, but then criticizes Nelson because he receives the inquiries.   Edelson has permitted Nelson's peers to review Nelson's work, but never permits Nelson to review the work of his peers.   During the summer of 2004, two summer interns were assigned to assist the Budget Unit Controllers; they were not introduced to Nelson nor were they asked to assist Nelson on any tasks.   Consultants and system support individuals at NYSE provide direct support to white members of the staff and cursory support to Nelson as a last resort.   Overall, white employees in other areas are reluctant to provide any support to Nelson or other African Americans, apparently afraid that their positions will be hurt if they do so.

       24.     When NYSE began the process of reorganizing several of its units in 2004, Nelson's already heavy workload was increased as he attempted to help other staff members adjust to the changes, and learn the new procedures.   When Nelson began to fall behind in his work in the summer of 2004, Edelson added to Nelson's responsibilities.   Nelson expressed concern that he would not be able to fulfill, in a timely manner, all of the tasks that Edelson was giving him.   Edelson responded with the warning that he "knew what would happen" if he did not meet Edelson's deadlines.

       25.     Edelson then further added to Nelson's work, requiring him to perform unnecessary, duplicative tasks that took up so much of Nelson's time that it made it more difficult

for Nelson to complete the larger projects for which he was responsible.

26.    One of the seven units for which Nelson was responsible was the Regulation Group. The financial work that Nelson performed as Business Unit Controller for the Regulation Group was very visible, interesting, and prestigious, and members of the Regulation Group were very happy with Nelson's work. In the fall of 2004, Edelson told Nelson that he was stripping Nelson of his responsibilities for the Regulation Group. Edelson then posted a new Business Unit Controller position, which would oversee the Regulation Group. The new Business Unit Controller was hired at grade 28, higher than Nelson's grade when he oversaw the Regulation Group and six other units.

27.    On January 13, 2005, Nelson received a negative performance review for 2004, which criticized his performance.

28.    In 2004, John A. Thain ("Thain"), the Chairman and Chief Executive Officer of NYSE, admitted, during a meeting attended by over 100 senior staff members of NYSE, that NYSE has a problem with diversity.

29.    Thain's comments concerning diversity at NYSE are well-founded. Upon information and belief, there are currently only two African-American officers at NYSE out of approximately 70 officers.

30.    Upon information and belief, over the past 25 years only one professional African American in Financial Planning and Analysis has been promoted more than once.

31.    Upon information and belief, approximately one-half of the African Americans who work for NYSE as professionals are assigned to perform regulatory work in the Regulation Group. Such regulatory work is considered to be among the least desirable kind of

work in NYSE.

32.     Upon information and belief, with the exception of the area of Regulation, few departments at NYSE that have multiple professional employees, have more than one African-American professional in a department and some departments have no African-American professional employees at all.

33.     During her tenure as Chief Financial Officer of NYSE, Butte hired 11 new professional employees.  Upon information and belief, none of these individuals is a minority member.

34.     During his tenure as Chief Executive Officer of NYSE, Thain has promoted or hired over 30 senior staff members.  Upon information and belief, only one of those individuals is a minority member.

FIRST CLAIM: SECTION 1981

35.     Plaintiff repeats and realleges ¶¶ 1-34 of this complaint as if set forth herein.

36.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his race in violation of Section 1981.

37.     Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

38.     Plaintiff is now suffering irreparable injury and monetary damage from defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## SECOND CLAIM: HUMAN RIGHTS LAW

39.     Plaintiff repeats and realleges ¶¶ 1- 38 of this complaint as if set forth herein.

40.     By the acts and practices described above, defendant has discriminated against plaintiff on the basis of his race in violation of the Human Rights Law.

41.     Plaintiff is now suffering irreparable injury and monetary damage from defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## THIRD CLAIM: CITY LAW

42.     Plaintiff repeats and realleges ¶¶ 1- 41 of this complaint as if set forth herein.

43.     By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of his employment on the basis of his race in violation of the City Law.

44.     Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

45.     Plaintiff is now suffering irreparable injury and monetary damage from defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a)     declaring the acts and practices complained of herein are in violation of Section 1981, the Human Rights Law and the City Law;

230000 v1

(b)      enjoining and permanently restraining these violations of Section 1981, the Human Rights Law, and the City Law;

(c)      directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)      directing defendant to place plaintiff in the position he would have occupied but for defendant's unlawful conduct and making him whole for all earnings he would have received but for defendant's unlawful conduct, including, but not limited to, wages, pension, bonuses, and other lost benefits;

(e)      directing defendant to pay an additional amount to compensate plaintiff for the emotional distress defendant's unlawful conduct has caused plaintiff;

(f)      directing defendant to pay plaintiff an additional amount as punitive damages;

(g)      awarding plaintiff such interest as is allowed by law;

(h)      awarding plaintiff reasonable attorneys' fees and costs; and

(i)      granting such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
July 12, 2005

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: _____
Judith P. Vladeck (JV 2908)
Anne C. Vladeck (AV 4857)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York  10036
(212) 403-7300